Mr. Schaffer for the appellant, Ms. Fortna for the appellee. Good morning, Your Honors. I'm Mr. Schaffer on behalf of Diag Human, and as the Court undoubtedly knows, it has before it a petition to confirm an arbitral award that was rendered against the Czech Republic in 2008 after a 12-year arbitration. That arbitration yielded five separate opinions, all of which are in this record. There was a massive motion to dismiss filed by the Czech Republic in 2013 when the case was commenced. That motion was never decided. Instead, in August of 2014, the District Court, Suis Ponte, decided that it had no subject matter jurisdiction because, in the Court's view, the award in question was not a commercial award that was rendered with respect to a legal relationship that was deemed as commercial under the Federal Arbitration Act, the U.N. Convention for the Enforcement of Foreign Arbitral Awards, which we commonly refer to as the New York Convention. And the relationship between the Czech Republic and Diag Human, that absent an alternative basis for jurisdiction, which was alleged under 1330 because the Czech Republic was not entitled to sovereign immunity, there was no jurisdiction, and therefore the Court dismissed. The key finding that the Court made in its opinion in August of 2014 was that Diag Human had brought against the Czech Republic prior to 1996 when the parties entered into an ad hoc arbitration agreement to resolve claims that Diag Human had brought against the Czech Republic in the Prague Commercial Court. Diag moved under Rule 59 for reconsideration of that in view of the fact that the record was replete with evidence that there was a commercial relationship between the parties. Did this arise out of the commercial relationship? Or is this a report that might be said to be independent of the relationship? Well, Judge Santelli, the relationship here was clearly a commercial relationship and the award did arise from it because the record contains findings by the arbitral panels that this event, the sending of a letter by the Czech Republic to Novo Nordisk, which was known by the Czech Republic to be the key element to fractionation of blood products, that was designed to disrupt the relationship between Novo Nordisk and Diag Human, therefore depriving Diag Human in any way. Question being, does that arise out of the relationship between the sovereign and the Czech Republic and the Diag Human? To be arbitrable, to be a waiver, I guess, a jump ahead, doesn't it have to arise out of the relationship to come within that exception of the… Yes, and we believe that the awards themselves make it quite clear that it did arise out of that relationship. That's what I'm asking you about. Did it arise out of that relationship? And what I thought you told me about was the relationship between Diag Human and Novo Nordisk. Novo Nordisk. I did, Your Honor. Tell me about the relationship of Czech Republic and the petitioner, or the appellant, and how this arose out of that relationship. Very simply, as the Court may know, Mr. Stava, who was the founder of Diag Human, developed a program whereby communist countries could modernize their blood transfusion programs in exchange for payment in the form of blood plasma, and that blood plasma was known to be the method at which Diag Human would be paid. The communist countries had no hard currency, so therefore it was entirely to their benefit to do so. But in order to get paid, we had to be able to fractionate the blood products. In 1990, Diag Human and the Czech Republic entered into a framework agreement pursuant to which Diag Human replicated its program in the Czech Republic. There is no one who will doubt, there is no one who will deny that Diag Human performed that agreement. It modernized Czech transfusion programs. Now, as I understand your claim, though, you're claiming that there was an interference of a business relationship between, that the Czech Republic committed an interference with business between Novo and the appellant, and you're claiming that it was a matter of slanderous trade, which both sound like tortious events that could occur independent of any pre-existing relationship with the Czech Republic, even if they said to be a commercial relationship, which it may well be. The statute, the Federal Arbitration Act, does not require that there be any contractual or agreement-based claim. There can be a tort-based claim as long as the claim is commercial. And, in fact, there are numerous cases so holding the fact that something is a commercial claim is not barred by the fact that it's tortious. It could be a commercial tort. In this particular instance... As far as what the waiver is within the exception, consistent with our precedent, it should be arising out of a commercial relationship. For jurisdiction under the Convention, that is true. The claim must arise from a relationship which is deemed as commercial. The fact that there was an arbitration which so found, and there was an award that so found, binds everybody here. You review that award as rendered. You don't go behind it and look to possible claims that may have been alleged but weren't. All of these findings were made against the Czech Republic in the arbitration. They're all in the record. And, in the context of this particular case, what the Czech Republic had been trying to do for years was to dispatch DIAGUMEN out of its contract with the Czech Republic. DIAGUMEN had already performed. It had modernized the Czech system, and yet it had no way to get paid because DIAG was being excluded from the marketplace. The capstone of doing that was the letter that the Czech Republic sent to Novo Nordisk because it realized, finally, that the way to get rid of this problem was to tell Novo Nordisk that it had questions about DIAG. The record shows that Novo Nordisk itself was, in addition to being a blood fractionator, involved in a direct proposal with the Czech Republic for diabetes. That would be a huge contract. And the arbitration board finds this, that Novo Nordisk actually understood what the Czech Republic was telling it about its possibility of success with respect to that. Namely, you'd better not do business with DIAGUMEN because you will not be able to get that contract. Can I just ask? I understood you to be arguing that there's a legal relationship between DIAGUMEN and the Czech Republic, and this arose out of that relationship. Not necessarily a contractual relationship, but there was a relationship. Ongoing purchase and sale of fractionalization equipment, tender offer, applications for permits, granting of permits, signing or initialing of a framework agreement. That's the relationship. Am I right about that? That is the primary argument. But even were the court to look at this separately, in other words, if you were to look at this as a result of an exclusion from a tender that the Czech Republic gave, that itself would create an independent commercial relationship. I don't see how that would follow. I understand what the Chief is asking you about, but how does a refusal to enter into a relationship arrive out of a relationship? It gives a claim. We cited the Kenton case. You may have a claim, but does it arrive out of a relationship for terms of bringing it within the convention and therefore within the exception to deny that? It requires a commercial relationship. Yeah, and refusal. How can refusal to enter into a commercial relationship create a commercial relationship? If it's a wrongful refusal to do so and you have a commercial court... No, no. For you it's right or wrong. How can any refusal to enter into a relationship create a relationship? You can have a claim. All that has to be is a relationship which is commercial. Right. It has to be a relationship which is commercial. The Chief has outlined what I thought to be your better argument. That is my argument. But I do not understand this one that says, well, because they refused to enter into a relationship, they're in a relationship. I wouldn't die in that ditch if I were fighting it. What the Chief Judge has articulated is the primary point, that a diagumen operated under a framework agreement. It had all the permits, it did what it was supposed to do, and it was barred through the conduct of the Czech Republic from getting paid for it. There's no one who's going to deny that. That is what the case is all about. But the point simply is that it's conceivable that you would have a claim based on an exclusion from the tender itself. But, Chief Judge, you are correct that that is the primary point, that we were the only bidder. We had the contract. We did what we were supposed to do. We were excluded from our known method of payment. And that's what the claim is based on. Further questions from the bench? We'll hear from the other side. Good morning, Your Honors. May it please the Court. My name is Elena Fortna, and I am here on behalf of Defendant Apelli, the Czech Republic Ministry of Health. As my opposing counsel has already discussed, the crux of this appeal really pertains to the issue of whether or not this arbitration and this award arose out of a commercial legal relationship not between Diog-Humann and another party, a third party, but whether it arose out of a commercial legal relationship between Diog-Humann and the Ministry of Health. And that's because that's the language of the New York Convention? Is that why you're saying that? Yes, Your Honor. So I have a question about whether we're approaching this in the correct order. So the Supreme Court has repeatedly held, and so have we, that the only, the exclusive way of getting jurisdiction over a sovereign Czech Republic is through the Foreign Sovereign Immunities Act, which suggests that the first place you look is not the New York Convention, which provides 1331 jurisdiction, but rather the Sovereign Immunities Act, which provides jurisdiction under 1330. And when I look at the Sovereign Immunities Act, I get a slightly different question in my mind. I look at A6. It seems to have two requirements relevant to your case. The first is there's no sovereign immunity in an action brought to enforce an agreement with respect to, to submit arbitration or any differences which have arisen with respect to a defined legal relationship. So it doesn't even say arising under. It just has to be with respect to, and that's what we said in the Belize case repeatedly. The question is related to, with respect to. And then the second, whether contractual or not. And then the second requirement is, and the one that's relevant here, the agreement or award is or may be governed by a treaty, may be governed by a treaty. It doesn't have to actually establish that it is governed by the New York Convention, just that it may be governed by the Convention. And we have two cases on this question. One is the Goudes-Chabad case, which says that all that's required for jurisdiction is a non-frivolous argument that it's covered by the Convention. You don't have to actually establish that it's governed by the Convention. That is a cause of action question. The jurisdictional question is only whether the claim is plausible, I think is the language. And similarly in the Chevron case, make the same point by emphasizing the may be governed. So I don't understand why we actually have to establish here whether it's under the Convention. That's for another day. That's for a ruling under 12b-6 or under summary judgment. But it's not for a ruling under 12b-1 for jurisdiction. Why is this analysis wrong? Well, Your Honor, because specifically for this case, and I think the complaint alleges this fact, as does the briefs of Diak-Human, they pled this case and brought this case in the District of D.C. pursuant to the New York Convention. Right, but the District Court's ruling threw it out only on jurisdiction. Am I right about that? That's correct, Your Honor. So the only question is whether we have jurisdiction. That's the only question before us, is whether there's jurisdiction in the District Court, right? Yes, Your Honor. We're not here to discuss the merits. We're here to only discuss jurisdiction. So isn't it the case? Why isn't it the case? I look at the two pieces of the Foreign Sovereign Immunities Act. Why isn't this the case? This has to do with differences which have arisen with respect to a legal relationship. Well, because the legal relationship, though, and the underlying dispute that we're talking about is an arbitration and foreign award. No, the legal relationship, the dispute is not about the arbitration. That goes to the second question. The dispute is about did they have any, was there any kind of legal relationship at all between Dieg-Human and the Czech Republic? And is this, were there differences with respect to that relationship? Now, they put in evidence in the form of the affidavit and in the form of the attached final arbitration decision. Yes, Your Honor. And those things say, whether they're true or not, this is a question for another day, but those things say that they had a framework agreement. It says it was signed. They said that they won the first tender or whatever it's called. Is it called a tender? Yes. Yes, they say they won the first tender. That seems like they established some kind of relationship. They say they had agreements with hospitals and that the hospitals are maybe not directly controlled but nonetheless owned by or under the control of the ministry. Why isn't that all enough to create a plausible argument, at least, that there is a legal relationship and that the dispute here, the letter, was intended to disrupt that and eliminate that relationship? Well, Your Honor, as we discussed pretty thoroughly in our brief and as well as the district court's second opinion after the motion to alter and amend, the documents, the additional evidence that was submitted with Mr. Stava's affidavit, if you look at the exhibits and you look and analyze the evidence, we're talking about a proposal to enter into a cooperation agreement, not an actual cooperation agreement but a proposal. But it's initialed, right? The cooperation program, that proposal is separate, yes. And then the framework agreement, it's directly titled a draft framework agreement. But it's initialed, right? It is initialed. So, I don't know, when you make a decision about whether or not to buy a house, you don't enter into the final mortgage documents and the final sale documents until the day of the closing. But you enter into an agreement to get to the agreement. Right, Your Honor. And that seems like what they've done here. Now, it doesn't, whether they've actually done that or not, they have a relationship. They've agreed sort of to get to the next step of agreement. It doesn't have to be a contract. It doesn't have to be a binding contract. It just sort of is an agreement that we're going to continue to negotiate. Isn't that what they have here? Well, Your Honor, I would respectfully say that under sort of basic contract interpretation and contract law, they have an agreement to agree. And then if you look at the subsequent— Isn't that a legal relationship whether contractual or not? That's the language of the statute, whether contractual or not, which suggests it doesn't have to be contractual. Well, but if you look at the subsequent actions in this case of the Ministry of Health, specifically the fact that after this cooperation proposal and after this draft framework agreement were submitted, which were actually—the cooperation program was between the Czech Transfusion Service and Diak-Humann's parent company, and then the draft framework agreement was between Diak-Humann's subsidiary company. But if you look at the following, the subsequent actions, the Ministry of Health opened up this public bid process, asking—seeking companies to tender proposals for the very work that this cooperation program and this draft framework agreement were addressing. Importantly, Diak-Humann did not contest that bid proposal. It didn't object to it. If it truly thought that it had an actual commercial agreement, which is argued in their briefs, or if it thought that it had a commercial relationship, why not object to the proposal? Well, I don't know why not, but the only question here is whether this is plausible, not whether there's something binding. Did they have agreements with hospitals in Czechoslovakia? Mr. Stava's affidavit alleges that there was framework agreements. Did you put any evidence to the contrary, that there were relations with some number of hospitals in Czechoslovakia? No, we did not, Your Honor. So we're bound by that. With respect to what Mr. Stava— Yeah, we're bound by what he said. Mr. Stava didn't submit any actual framework agreements. No, but he submitted his testimony that there was agreements with some number of hospitals, right? He did, but he didn't specify exactly which hospitals. That makes it weak evidence, but it doesn't make it zero evidence. This may make it something you can argue when you get to the merits, but we're on the jurisdictional question here. Well, I think that the critical component and what the district judge I think aptly honed in on was the fact that while Mr. Stava's affidavit spoke about these alleged commercial agreements or framework agreements with individual Czech hospitals, this was after that change in the Czech law in June of 1990 that basically deregulated everything. When you say deregulated, is your position that the Ministry of Health doesn't have any relationship to those hospitals? At that point, as Mr. Stava alleges, Ministry of Health lost control over those hospitals. No, it said direct control. I read it. It said direct control. Is Czechoslovakia's position that they have no authority at all over those hospitals? They own some—they may own some of the hospitals. I think there was reference to university hospitals, but they don't directly control. They're not entering into agreements with respect to those hospitals. What does direct control mean as compared to indirect control? Well, by saying they don't have direct control, it's because of that change in the law. They no longer specifically—they no longer basically ran the show with respect to these Czech hospitals. There was basically a change—there was a change in the law, and it altered the way that— How would you describe the relationship between the Ministry of Health and the hospitals after that time? It says, according to the Stava, legally these hospitals remain state property. Is that false? State property? I don't believe that's false. So that's what he says in paragraph 9, the hospitals are state property. I don't believe that that's false, Your Honor. So that means it's true. As far as I know, to my knowledge. Well, at least for our purposes, we have to take it to be true. Right. Yeah. I thought your initial argument here, you were defending the district court's position, which was that this did not arise out of— in other words, that the subject of the arbitration did not arise out of this relationship, assuming there was one. Yes, Your Honor. Correct. And so I guess my question is, if that's the argument, aren't you bound by at least the findings of the arbitration tribunal? In other words, what you seem to be arguing with the Chief Judge is that there was no relationship, but the arbitration tribunal found, in fact, that there was, and that it was a commercial relationship. So I guess what I'm trying to figure out is, does the Czech Republic accept the findings of the arbitral tribunal and is simply arguing that this arbitration did not arise out of that? Well, Your Honor, I think that there's multiple aspects to that question. Certainly the arbitration proceedings have continued in the Czech Republic, and I don't know that that's necessarily something that I should address at this juncture. Well, you're saying have continued. I thought this was a final award. You're saying that this isn't final? Well, there was a subsequent, there was an appeal. In the record, it discusses the fact that both parties submitted an appeal of the final award, and it took years for an arbitration appeal panel to- But I thought that that was decided against the Czech Republic. That's how I- No, the final award was not, that was not reviewed by the arbitration appeal panel at that point in time, at the point that this decision came through, which was part of, that was part of one of our arguments before the district court was that the award was not yet final and binding because there was an appeal to the arbitration appeal panel. Is it final and binding now? Well- Well, there was an appeal. What was the result of the appeal? Well, I, my understanding is that the final award was determined to be basically null and void. I don't want to get into it too deeply because I don't, I don't, I can't speak on it very specifically. When you say null and void, do you mean by a Czech court, or do you mean by an arbitration appeal? An arbitration panel? Uh-huh. Is that evident from your brief or any other brief in this case? No, Your Honor. Would that not seem to be a salient fact to have brought to the attention of the court if we're litigating over an arbitration award that an arbitration panel has said is not valid? I'm not sure what we would be doing here if that's true. I apologize, Your Honor. The limited scope of the appeal, as the Chief Judge pointed out, was related to the subject matter jurisdiction. Would we have a subject matter jurisdiction if this were not a final award? Well, no. I would argue no. Well, why didn't you argue no, then? If it's the case that it's not a final award, why didn't you argue that? I think just based on the limited narrow scope of the appeal and where the facts were at that point in time. Jurisdiction is always an issue. I mean, either it's there or it's not. Right. And if there's not a final award, is there jurisdiction? I would argue no. Well, why didn't you argue no? You didn't argue no either below or here. I don't know. I may be overlooking something, but I didn't see it in there. None of us seem to have seen in the brief any evidence from you that says this is not final. We did, Your Honor, argue in the district court that the award had not been final and enforceable based on the subsequent appeal to the arbitration panel. Regardless of whether it's final, is your position that the whole case is moot now because the arbitration award has been overthrown by the arbitration panel itself? Possibly. Okay. Any further questions from the panel? No. All right. Hopefully we'll hear something from the other side on this. There are several points I want to make first. Make them about this first. Yes. With respect to this, none of this, none of the subsequent events are in the record here. What's the fact here? There has been a purported determination by a purported arbitral review panel, all three of whose arbitrators were selected by the Czech Republic. The effect of this, no one knows. The Czech Republic has never brought it to the district court. We've never brought it to the district court because what its effect is is unknown and, at this point, I think unknowable. With respect to Judge Santelli's question, the question of whether the award is final or not is not a jurisdictional question. That would not deprive you of jurisdiction whatsoever because that would simply be a defense to the enforcement but not a jurisdictional issue. So I don't believe that this would deprive this court of jurisdiction. But the effect, if any, on this putative review award has never been reviewed. At the very least, there would be a problem with prudential rightness if there were, in fact, a non-finality to the arbitral award. That would be a defense. It would not make any sense for the court to hear litigation about an arbitration award that was still subject to being set aside by the arbitration process. The claim in the district court, the defense in the district court, was a lack of finality, which Dyag had plenty to say about. What subsequently happened is an award, a putative award, which was rendered by an appellate panel, and no one knows what the effects are. No one has examined it. It wasn't the intention of either this court or the district court at this point that there is such a putative award. The district court was told by me in a footnote that there had been subsequent events which were not of record, and the court should know that. That didn't tell the district court very much. The district court looked at footnotes, which are very much marginal. That's correct, because the effect of this award is not known. No one has passed on it yet. Obviously, the fact that the Czech Republic didn't bring it anywhere is suggestive of something, and I certainly am not bringing it somewhere because I would have a lot to say about the putative award. But it's not a jurisdictional fact whatsoever. It's a defense. With respect to the Chief Judge's questions about ownership… Before we get to that again, so the thing we have in the appendix is titled final award, right? Correct. What does that mean? That award was the final award that was rendered after a 12-year arbitration. What then happened, and this is also in the record, is that both sides took an appeal. An appeal to? Well, under the structure that was agreed to, and this is quite uncommon in this country, there was an appellate arbitral process pursuant to which you would… Established by the original agreement to arbitrate. Correct. And you would be able to take an appeal, if you so desired, to this appellate panel, which would then review the award that had been rendered by the original arbitrators. If the court takes a look in the record that exists, the court will see that there are two such awards. There's an interim award. There's a preliminary award, both of which were appealed and both of which have opinions by an arbitral panel on review. With respect to this award, the validity of that appeal was something that was very… I guess I had assumed, perhaps wrongly, that the interim one was on the way to the final one, but that's not correct? The interim? Yes, you are correct. By the same panel as decided the final award or by a different… No, the arbitrators, there was a change in the arbitral composition over time.  Correct. So the final award overtakes the interim awards? Well, sequentially what happened was the following. There was an interim award… I'm sorry, there was a preliminary award. The preliminary award, which was rendered in 1997, established liability by the Czech Republic to Dyett. The question was clearly determined there. It was affirmed by an appellate arbitral panel. So there was an appeal of that one? Correct, and that is binding. Those facts are binding. But there is no award, no monetary award in that, just liability? Correct. Okay. Then there is a preliminary award. The preliminary award was rendered in 2002 after submission of evidence. The award in 2002 was rendered on the basis of the minimum agreed upon damages between both sides' experts. So the preliminary award moved to the interim award. The interim award fixed a minimum quantum of damage in 2002, which in dollar terms at that point was roughly $10 million. The remaining arbitration from 2002… And that one was appealed also? Correct, and affirmed. With respect to the final award, that determined the quantum of damages remaining other than what both parties had agreed to in 2002. This was the subject of massive amounts of expert testimony. At the end of the day, the arbitral panel rendered a final award, and it rendered an award based on the low end of the damages that the experts had awarded to Dyett-Juhmann. In other words, both their expert and our expert submitted evidence. What ended up happening was that the arbitral panel selected the low end of damages as being what we were entitled to. Both sides took an appeal from that. Dyett took an appeal on the ground that the award was too low. The Czech Republic took an appeal. It wasn't clear what the basis of the appeal was, because there had been clear findings of liability. What was the result? What happens next? The result of that was a multi-year litigation over the… Was there a decision by the appeal panel? As far as I know, there was some sort of ruling by a putative appeal panel, which was composed of three arbitrators ultimately selected by the Czech Republic itself. But the effect of what that panel did, its validity, anything like it, has never been determined, has never been tested in any court that I'm aware of, and has never been brought to the district court. So what its effect is has never been… In words, did it vacate the decision of the final agreement? It did not vacate anything. Has anybody read this thing? Yes. So what's the bottom line? The bottom line… Whether you agree with it or not, what's the bottom line? The bottom line is that, as I understand the Czech procedural point… Quit chasing rabbits down trails and I can be quick and pleased. The award said that… It wasn't an award. Quit chasing rabbits and tell us what it said, please. What it said was that the award which was rendered in 2000… As I understand it, the award that was rendered in 2002, namely this $10 million interim award, that was the final award because under Czech law you couldn't have anything after that. So there's no dispute even after the appeal that there is at least the… What million dollar did you say? $10 million. $10 million award. Is that what you're saying? That's been paid. And that's been paid? Czech Republic paid that award as directed. So that may be the end. There may be no other award. Is that what you're saying? It's… If that appeals panel is a valid one and its ruling was correct and there were no ways to upset that… And how would that be determined? If the district court were to get to the merits, how would that… Would the district court determine that? No, I think that… Who would determine that? I think that there are proceedings pending in the Czech Republic as to its validity. So until those are resolved, even if there were jurisdiction in this case, the district court could not get to the merits. Is that what you're saying? No, I don't say that because as far as we're concerned, the effect of that ruling by the panel, its actual effect was to make the 2008 award final and bind it. I thought you said that there was no 2008. It decided that 2002 was the only award possible. That may be its effect. Our view is that, in reality, what all that award could possibly do was render the 2001 final. That's what I was asking. Is that for the district court to determine whether that's correct or is that for the Czech panel to… It may be the district court has to determine that, but I know that there are proceedings pending. It's my understanding that there are proceedings pending in the Czech Republic with respect to what the effect of that pronouncement was. And it's not an award. It's a ruling by a panel, which, as I understand it, is not subject to any appeal, which was why it was rendered in the way it was rendered, and there were proceedings with respect to that that I am utterly unaware of. If the consequence of that is that all you get is the $10 million, there would be no case here. Is that right? Because you already got your $10 million. If there's no basis to upset that pronouncement or if that pronouncement has an effect other than what we believe, which is to render the 2008 award final and binding, there would be nothing further. Are there provisions in the New York Convention for making those kinds of determinations by district courts? The New York Convention provides as a defense lack of finality. So if the award isn't final or it's been overruled, then the district court can make that determination by itself. Laying aside for a moment the question of whether prudential rightness is or is not jurisdictional, which you seem very sure it isn't, lay that aside because the Chief brought us back to the very basic question, and that is jurisdiction has to come out of the FSIA. What language in the FSIA do you say governs the jurisdictional question in this case? Well, it's a peculiar situation, Your Honor, because— Don't tell me about the situation. Listen to my question very carefully. Because the FSIA— What language—listen to my question. Don't talk while I'm asking you to listen, please. What language in the FSIA do you say governs the jurisdictional question in this case? The FSIA does not allow a defense of sovereign immunity if there is an award that is or may be subject to a foreign convention. Okay, so that's A6, right? Correct. That was the original basis in the district court under the FAA and why there was no possible defense of sovereign immunity, and this court has the Termarillo case, which is so determined as far as I know. So that was the basis for it. What are the conditions in the FSIA, if any, that govern that waiver, that statutory waiver? The standards? Yes. The only standard— Do you have the language of the FSIA in front of you? I do. Okay, how about reading that segment to us, please? Other than A6? No, A6. He's talking about A6. Read us A6. It's a bit longer than what the description of it was. Okay. A foreign state shall not be immune from the jurisdiction of courts of the United States or of the states in any case— in which the action is brought either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration any or all differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate if a. the arbitration takes place or is intended to take place in the United States, b. the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, c. the underlying claim, save for the agreement to arbitrate, could have been brought in the United States court. C is not relevant and A is not relevant, right? We're only talking about B. Yes, sir. Yeah. Okay. Further questions from the panel? No, I think that's it. All right. We'll take the matter under submission. Thank you.
judges: Garland, Brown, Sentelle